UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

KERRILEE LOGAN,

Plaintiff,

v.

FACTSET RESEARCH SYSTEMS INC.,

Defendant.

CIVIL ACTION NO:

MAY 11, 2026

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff, Kerrilee Logan (hereinafter, "Plaintiff"), by and through the undersigned counsel, Carey & Associates, P.C., files this Complaint against the Defendant, FactSet Research Systems Inc. (hereinafter, the "Defendant"). Plaintiff alleges as follows:

## PRELIMINARY STATEMENT

1. Plaintiff's Complaint asserts claims for: (1) discrimination based on sex in violation of Title VII, 42 U.S.C. § 2000e *et seq.* ("Title VII"); (2) hostile work environment based on sex in violation of Title VII; (3) retaliation in violation of Title VII; (4) discrimination based on race and color in violation of Title VII; (5) retaliation and discrimination based on race in violation of 42 U.S.C. § 1981; (6) discrimination based on disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"); (7) failure to accommodate in violation of the ADA; (8) retaliation and interference in violation of the ADA; (9) interference and retaliation in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"); (10) discrimination, hostile work environment, retaliation, and failure to accommodate in violation of the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 *et seq.*

1

("CFEPA"); (11) interference and retaliation in violation of the Connecticut Family and Medical Leave Act, Conn. Gen. Stat. § 31-51kk *et seq*. ("CTFMLA"); (12) failure to timely pay final wages in violation of Connecticut wage law; (13) negligent infliction of emotional distress; and (14) intentional infliction of emotional distress.

## PARTIES

2. Plaintiff, Kerrilee Logan, is a resident of the State of Connecticut. Most of Plaintiff's work for the Defendant was performed in Connecticut.

3. Defendant is a domestic company with its principal place of business in Norwalk, Connecticut. At all times relevant to this Complaint, Defendant conducted business within the jurisdiction of this Court.

4. At all times relevant to this Complaint, Defendant conducted business within the District of Connecticut and employed Plaintiff within the meaning of Title VII, the ADA, the FMLA, CFEPA, and CTFMLA.

5. At all times relevant to this Complaint, the individuals identified herein, including Defendant's managers, Human Resources employees, Legal/Compliance employees, and supervisory employees, acted as agents of Defendant and within the scope of their employment.

## PROCEDURAL PREREQUISITES

6. On August 7, 2024, Plaintiff filed a "dual charge" of discrimination against Defendant with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the United States Equal Employment Opportunity Commission ("EEOC").

7. On March 4, 2026, the EEOC sent a Notice of Right to Sue letter regarding Charge No. 523-2024-02851 to the Plaintiff (Exhibit "A").

8. On February 9, 2026, the CHRO sent a Release of Jurisdiction regarding CHRO 2520247 to the Plaintiff (Exhibit "B").

9. Plaintiff exhausted all administrative remedies under both Federal and Connecticut law.

## JURISDICTION AND VENUE

10. Plaintiff's claims pursuant to the ADA, Title VII, and 42 U.S.C. § 1981 raise questions of federal law.

11. This Court has jurisdiction over the ADA, Title VII, and 42 U.S.C. § 1981 claims pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Plaintiff's remaining claims, including those under the CFEPA, CTFMLA, and Connecticut common law, which arise from the same case or controversy, pursuant to 28 U.S.C. § 1367(a).

12. The District of Connecticut is the appropriate venue for this matter pursuant to 28 U.S.C. §§ 1391(b)(1) and (2), as the unlawful conduct complained of herein took place within the District of Connecticut.

## FACTUAL ALLEGATIONS

13. Plaintiff currently resides in Manchester, Connecticut and worked for Defendant at their Norwalk, Connecticut office.

14. Plaintiff is a Black/African American woman.

15. Defendant is a corporation, with a business address of 45 Glover Avenue, Norwalk, Connecticut 06850.

16. Plaintiff was hired by Defendant on February 28, 2022 as a Client Solutions Associate. Defendant assigned Plaintiff to its Norwalk, Connecticut office, but Plaintiff worked

primarily from her home in Manchester, Connecticut. Defendant paid Plaintiff a base salary of approximately $72,000 per year and a signing bonus of approximately $3,000.

17. In or around August 2022, Mr. Carl LaRosa became Plaintiff's direct manager.

18. During a one-on-one meeting on or about August 5, 2022, Mr. LaRosa made inappropriate remarks to Plaintiff, including telling Plaintiff that she should be more "cutesy" when interacting with a potential customer. Plaintiff understood Mr. LaRosa's tone to be flirtatious and inappropriate.

19. Plaintiff did not immediately report Mr. LaRosa's comments because she was not yet promoted from Associate to Consultant and feared jeopardizing her career path at FactSet.

20. On or about October 27, 2022, Defendant promoted Plaintiff to Consultant, Client Solutions.

21. On or about December 14, 2022, Plaintiff attended a client-related meeting with Mr. LaRosa. During that meeting, Mr. LaRosa stared at Plaintiff's breasts, chuckled, and appeared to have an erection. Mr. LaRosa's conduct made Plaintiff extremely uncomfortable.

22. Plaintiff had observed Mr. LaRosa staring at her breasts on other occasions and began wearing larger shirts and dressing in layers when she was in the office to cover her breast area.

23. On or about January 13, 2023, Plaintiff met with Mr. LaRosa for a "coffee chat" to discuss his conduct. When Plaintiff attempted to raise a sensitive topic, Mr. LaRosa appeared nervous and blurted out, "I don't date my Consultants." Plaintiff responded, "I wasn't going to say that." Mr. LaRosa then yelled words to the effect of, "No, No, that's

4

just me trying to be your friend," and rushed to his vehicle. Plaintiff believed Mr. LaRosa was attempting to deflect and manipulate the conversation so that Plaintiff would appear to be the person acting inappropriately.

24. On January 18, 2023, Defendant held a company holiday event at The Warehouse at FTC in Fairfield, Connecticut. Plaintiff attended the holiday event. During the event, Plaintiff expressed excitement about having an opportunity to interact and take a photograph with Defendant's CEO, Phil Snow. In response, Plaintiff's coworker Joshua Fennessey stated, "You should get him drunk, so he cheats on his wife." Plaintiff found Mr. Fennessey's comment inappropriate but ignored it.

25. After the event, on January 18, 2023, several FactSet employees went to Archie Moore's Bar & Restaurant, located near the event venue. While at the bar, Plaintiff spoke with Mr. Fennessey and Jennifer Barbour. During that conversation, Mr. Fennessey took his open right hand and pushed Plaintiff in her left breast. The push was so hard that Plaintiff stumbled backward. Ms. Barbour witnessed the assault but did not say anything. Plaintiff was shocked and attempted to continue functioning in the moment as a stress response.

26. The next day, January 19, 2023, Plaintiff woke up with significant pain in her left breast and chest area.

27. Plaintiff later sought medical treatment for her injuries.

28. On or about February 1, 2023, Plaintiff reported the incident to the Fairfield Police Department.

29. On or about January 26, 2023, Plaintiff reported the incident involving Mr. Fennessey to Tyler Campbell, one of Defendant's recruiters, through Microsoft Teams. Plaintiff had

follow-up discussions with Campbell on or about January 31, February 2, and February 6, 2023.

30.   During her conversations with Mr. Campbell, Plaintiff also discussed inappropriate conduct by an "authority figure," referring to Mr. LaRosa. At the time, Plaintiff did not identify Mr. LaRosa by name during those initial conversations because she feared retaliation. Mr. Campbell told Plaintiff that he would consult with his manager, Kira Irchirl, and that Ms. Irchirl would discuss the matter with Defendant's Chief of Compliance.

31.   Defendant did not meaningfully follow up with Plaintiff regarding the identity of the "authority figure" or investigate Mr. LaRosa's conduct at that time.

32.   In late January or early February 2023, Plaintiff attempted to speak with Mr. LaRosa about the incident involving Mr. Fennessey. Plaintiff was aware that Mr. LaRosa and Mr. Fennessey were friends and was uncomfortable with the situation. When Plaintiff attempted to discuss the matter with Mr. LaRosa, Mr. LaRosa yelled words to the effect of, "You know what Kerri, it's either you have something to report or you don't." Based on Mr. LaRosa's reaction, Plaintiff did not feel safe reporting Mr. Fennessey's conduct to him.

33.   On February 6, 2023, Plaintiff reported Mr. Fennessey's assault to Defendant's Legal and Human Resources personnel.

34.   On February 7, 2023, Plaintiff provided a written statement to Dolores Linehan and Lisa Hughes as part of Defendant's investigation. Plaintiff's written statement described Mr. Fennessey's lewd comment, the physical contact with Plaintiff's breast, Plaintiff's pain and medical treatment, and her police report.

35. On or about February 16, 2023, Plaintiff provided Defendant with a police report regarding Mr. Fennessey stemming from a different incident in which Mr. Fennessey had allegedly grabbed a police officer during an incident at his residence in December 2022.

36. On or about February 24, 2023, Ms. Hughes and Melanie Garatoni informed Plaintiff that Defendant had been unable to substantiate her allegations regarding Mr. Fennessey. Defendant told Plaintiff that she and Mr. Fennessey were expected to act courteously and professionally.

37. Defendant did not meaningfully separate Plaintiff from Mr. Fennessey. Defendant did not provide Plaintiff with effective protection from retaliation or continuing distress associated with working around Mr. Fennessey.

38. Plaintiff expressed concern about continuing to work with Mr. Fennessey and asked whether she could relocate to Defendant's New York office. Defendant did not grant Plaintiff's request to transfer to the New York office.

39. Plaintiff was also concerned about continuing to report to Mr. LaRosa, given his own conduct toward her and his friendship with Mr. Fennessey.

40. After Plaintiff reported Mr. Fennessey's conduct, Mr. LaRosa's treatment of Plaintiff changed. Mr. LaRosa became shorter with Plaintiff, yelled at her, and scrutinized her attendance.

41. On or about April 24, 2023, Defendant's Chief Revenue Officer, Helen Shan, issued a communication to the Sales organization regarding in-office expectations.

42. Defendant identified Norwalk's collaboration days as Wednesdays and Thursdays. In-office collaboration days were only first discussed post-pandemic in May 2023 and were not identified as an essential function of Plaintiff's position. In fact, Plaintiff's offer letter

did not specify a required time period or requirement for her to physically be in the Norwalk office.

43. The April 24, 2023 communication stated that employees were generally expected to be in the office two days per week but also acknowledged that employees may need to travel or attend to personal commitments.

44. The communication did not state that employees were prohibited from being sick, taking PTO, taking vacation, or attending medical appointments on collaboration days.

45. Plaintiff experienced panic attacks and anxiety when required to be in the same space as Mr. Fennessey. Even seeing Mr. Fennessey in the parking lot could trigger a panic attack.

46. Plaintiff reported to Mr. LaRosa that being in the same room or on the same video call as Mr. Fennessey caused symptoms including a racing heart, sweating, dizziness, and fear that Mr. Fennessey might attack her again.

47. On or about May 17, 2023, Human Resources Business Partner Ms. Garatoni and Mr. LaRosa met with Plaintiff regarding her absences and in-office attendance. Plaintiff was accused of evading the office and misusing sick time or otherwise failing to comply with the in-office collaboration-day requirement. Plaintiff denied that she was attempting to avoid her job duties. Plaintiff had used sick time and PTO because she was ill and because her mental health symptoms had worsened after the assault, Defendant's response to her complaint, and the requirement that she continue working around Mr. Fennessey and Mr. LaRosa. The May 17, 2023 meeting only exacerbated Plaintiff's anxiety and distress.

48.    Defendant's baseless attendance accusations and failure to protect Plaintiff from the consequences of sex-based misconduct aggravated Plaintiff's preexisting anxiety condition.

49.    On or about June 6, 2023, Plaintiff notified Defendant that she had been diagnosed with Depression and PTSD in 2016 by her clinical psychologist.

50.    Plaintiff informed Defendant that symptoms of her disability began affecting her work duties around November 2022 and worsened in January 2023.

51.    Plaintiff requested immediate federal FMLA and CTFMLA leave through July 31, 2023 to receive treatment through a psychiatric treatment program.

52.    Plaintiff's leave was approved, and she was on leave from approximately June 7, 2023 through August 20, 2023, with a scheduled return-to-work date of August 21, 2023. During her leave, Plaintiff participated in treatment for her mental health, including an intensive outpatient program.

53.    On or about August 10, 2023, Plaintiff's medical provider cleared Plaintiff to return to work on August 21, 2023 with restrictions. Plaintiff's provider recommended that Plaintiff return to work in a full-time remote capacity, except when onsite client visits were necessary. Plaintiff's provider explained that the recommendation aligned with Plaintiff's ADA accommodation request and that Plaintiff had been diagnosed with a disability. Plaintiff's provider requested that, if remote accommodation was not feasible, Defendant initiate the interactive process to explore alternative reasonable accommodations.

54.    On or about August 25, 2023, Defendant denied Plaintiff's requested full-time remote accommodation. Defendant stated that in-office collaboration days were essential for

consultants and consulting teams and asserted that full-time remote work could not be accommodated as requested.

55. Defendant instead offered Plaintiff an assigned seat on the second floor of the Norwalk office for three months and two weeks of remote work on Wednesdays as a transition from leave.

56. Plaintiff asked Defendant why the fully remote accommodation request was not accepted and whether there was an appeal process.

57. Defendant did not provide Plaintiff with a meaningful explanation adequate to justify rejection of her provider's recommended accommodation.

58. Defendant's alternative accommodation did not adequately address Plaintiff's disability-related need to avoid triggers associated with the Norwalk office and the employees involved in, or connected to, her reported harassment and assault.

59. After returning from leave, Plaintiff attempted to comply with Defendant's in-office requirements, but she continued experiencing anxiety and panic attacks. Plaintiff experienced distress even from seeing Mr. Fennessey in the parking lot and from attending meetings where she feared encountering him. Plaintiff also continued having difficulty working with Mr. LaRosa, whom she understood to be close with Mr. Fennessey.

60. On or about October 16, 2023, Plaintiff had a weekly meeting with Mr. LaRosa. During that meeting, Mr. LaRosa continued to verbally attack Plaintiff. Plaintiff asked to be assigned a new manager because she was tired of being abused by Mr. LaRosa.

61. After the October 16, 2023 interaction, Mr. LaRosa contacted Human Resources and accused Plaintiff of acting inappropriately toward him. Mr. LaRosa suggested that

Plaintiff had a "crush" on him and accused her of sending him an anonymous text during the summer. Mr. LaRosa's claims were false and retaliatory.

62. Defendant ultimately transferred Plaintiff to the Boston team, supervised by Courtney Zwarg, effective on or about October 27, 2023. Although Plaintiff's new manager was based in Boston, Defendant continued to require Plaintiff to report to the Norwalk office on Wednesdays and Thursdays.

63. Christopher Richardson, Defendant's Lead Human Resources Business Partner, became increasingly involved in monitoring Plaintiff's attendance. He imposed an 8:30 AM to 5:30 PM requirement to Plaintiff, which was not stated in the April 24, 2023 company-wide return-to-office communication. This was applied to Plaintiff as part of the escalating scrutiny after her protected activity and disability-related leave.

64. Plaintiff remained confused by Defendant's rigid application of the in-office requirement because she observed that peers came in later than 8:30 AM on collaboration days and were not subjected to the same scrutiny.

65. On or about November 16, 2023, Mr. Richardson emailed Plaintiff regarding Defendant's attendance expectations. Mr. Richardson asserted that Plaintiff continued to miss and/or schedule personal appointments on in-office days and that her absence pattern was unacceptable. He told Plaintiff that this was the third time that year that Defendant had addressed her in-office attendance. Mr. Richardson required Plaintiff to provide a list of all scheduled PTO and appointments through the end of the year.

66. On or about November 17, 2023, Plaintiff provided Mr. Richardson with a list of her scheduled PTO and appointments through the end of the year and sent calendar invites. Mr. Richardson did not inform Plaintiff that she could not take those days off, that she

11

was prohibited from scheduling medical appointments on those days, or that she was required to change her appointments.

67.   Plaintiff also took bereavement leave from November 24, 2023 to November 28, 2023.

68.   Plaintiff's bereavement leave did not fall on Defendant's in-office collaboration days.

69.   Defendant singled Plaintiff out for heightened scrutiny over her PTO, medical appointments, office arrival, and whereabouts.

70.   Mr. Richardson later admitted that no other employees at that time were required to email him regarding their PTO use. He made several admissions demonstrating pretextual animus specifically that no other employees were required to email him when they were in the office and no other employees were required to email him a list of anticipated doctor appointments. Further, he admitted there was no policy prohibiting Plaintiff from working in a booth on the eighth floor of the Norwalk office and he was not aware of how Plaintiff's use of PTO on in-office versus remote days compared to other employees' use of PTO. Mr. Richardson admitted there were no issues with Plaintiff's working hours or attendance on remote days. These admissions demonstrate that Defendant treated Plaintiff differently than her coworkers and imposed rules on Plaintiff that were not imposed on similarly situated employees.

71.   On December 7, 2023, Plaintiff logged into work from her home office, responded to Ms. Zwarg regarding reserving a collaboration room, and traveled to Defendant's Norwalk office. Plaintiff worked from the eighth floor of the Norwalk office. Mr. Richardson found Plaintiff and confronted her about her office attendance. Mr. Richardson was combative and aggressive. He told Plaintiff that her use of PTO was "not a good look."

Mr. Richardson stated or implied that he could create new policies preventing Plaintiff from taking PTO or medical leave and that he could "do anything he wanted."

72. Mr. Richardson's confrontation caused Plaintiff to suffer a severe anxiety attack. Plaintiff went to the emergency department on December 7, 2023 as a result. Plaintiff was diagnosed with anxiety, chest pain, and panic attack.

73. At 11:27 AM on December 7, 2023, Plaintiff emailed Mr. Richardson and requested to go on FMLA effective December 7, 2023. Mr. Richardson did not meaningfully respond to Plaintiff's FMLA request or process it in good faith. Instead, Defendant investigated Plaintiff's badge swipes and VPN access and moved to terminate her employment.

74. On December 8, 2023, Defendant terminated Plaintiff's employment effective immediately. Defendant's termination letter claimed that Plaintiff told her manager shortly after 9:00 AM on December 7, 2023 that she had made it into the office, that Mr. Richardson went to Plaintiff's assigned desk at approximately 10:00 AM and found it empty, and that company records indicated Plaintiff did not arrive until after 11:00 AM.

75. Defendant falsely accused Plaintiff of dishonesty and of attempting to circumvent management directives requiring her to be in the office on collaboration days. Defendant claimed that Plaintiff had "consistently attempted to limit" her in-office attendance "by any means necessary." Defendant's stated reasons for Plaintiff's termination were false, exaggerated, and pretextual.

76. Defendant's own witnesses later admitted that Plaintiff's manager, Ms. Zwarg, was not involved in the termination decision and that the attendance information came from Mr. Richardson who caused Plaintiff to suffer a severe anxiety attack.

13

77. Ms. Zwarg supervised Plaintiff for only approximately six weeks before Plaintiff was terminated. Ms. Zwarg was based in Boston, and even on collaboration days, Plaintiff and Ms. Zwarg worked in separate offices. Ms. Zwarg was not made aware that Plaintiff had complained of sexual assault, that Plaintiff had disabilities, or that Plaintiff had requested or been granted accommodations.

78. Defendant terminated Plaintiff approximately twenty-four hours after she requested FMLA leave on December 7, 2023.

79. On December 10, 2023, after her termination, Plaintiff submitted a detailed complaint regarding Mr. LaRosa's sexual harassment, inappropriate conduct, verbal assaults, retaliation, and racial bias to Defendant. Defendant acknowledged receipt of Plaintiff's complaint but did not meaningfully investigate it while Mr. LaRosa remained employed.

80. Defendant's failure to protect Plaintiff from Mr. LaRosa and Mr. Fennessey, its rejection of Plaintiff's requested accommodation, its heightened monitoring of Plaintiff's attendance and medical appointments, and its termination of Plaintiff immediately after her FMLA request constitute discrimination, retaliation, interference, and failure to accommodate.

81. Defendant has confirmed that Plaintiff reported the sexual assault by Joshua Fennessey on February 6, 2023 and that Melanie Garatoni was assigned to investigate Plaintiff's allegations.

82. Defendant's investigation did not disprove Plaintiff's report. Rather, Defendant claimed that witnesses did not substantiate Plaintiff's allegations and then required Plaintiff to continue navigating the workplace without meaningful separation from Mr. Fennessey.

83. Defendant's own account confirms that Plaintiff sought a move to the New York office or a New York team shortly after the investigation, which is consistent with Plaintiff's effort to avoid continued exposure to Mr. Fennessey and the hostile Norwalk work environment.

84. Defendant admitted Plaintiff requested an ADA accommodation, engaged with Naleenee Dharry in Defendant's benefits department, and initially sought an accommodation that would allow her to work fully remotely for a finite period except when onsite client visits were necessary.

85. Defendant's reliance on Plaintiff's use of PTO, sick time, medical appointments, and leave is evidence of retaliatory and disability-based animus, particularly because Defendant singled Plaintiff out for reporting obligations not imposed on others.

86. The close temporal proximity between Plaintiff's December 7, 2023 FMLA request and her December 8, 2023 termination, together with Defendant's reliance on protected or disability-related absences and medical appointments, supports a strong inference of retaliation and interference.

87. Plaintiff further alleges that Defendant's reliance on subjective characterizations of her demeanor, including claims that she rolled her eyes, fidgeted, appeared distracted, or appeared visibly annoyed, reflects stereotyped and biased treatment of a Black female employee who had complained of sex-based misconduct and sought medical leave and accommodation.

88. Upon information and belief, Defendant has a known history of male leaders sexually harassing female employees. Plaintiff was informed that Barry Fortuna and Jeffery Spector, both former leaders, were terminated for sexual harassment. In particular, Tyler

Campbell, an employee in Defendant's DEI/recruiting function informed Plaintiff that Mr. Fortuna, former Director of the Northeast region where Plaintiff worked, sexually harassed female subordinates. Mr. Fortuna exited Defendant abruptly and had a noticeable gap in his resume following his exit before he joined another company in a lateral move.

89. Upon information and belief, Mr. Richardson also scrutinized at least one other Black female employee after that employee returned from protected medical leave, including by questioning her Microsoft Teams "away" status and attendance rather than identifying performance-based deficiencies at that time.

90. Plaintiff alleges that this comparator evidence supports an inference that Defendant, through Human Resources, targeted Black women who exercised medical-leave rights or returned from protected leave.

91. Plaintiff further alleges that Defendant's reliance on time-of-day and physical-location issues treated Plaintiff like an hourly employee subject to individualized monitoring, even though Plaintiff was a salaried Consultant and Defendant's company-wide return-to-office communications did not identify the rigid rules later imposed on her.

92. Before Plaintiff filed her formal complaint against Mr. Fennessey with Legal and Human Resources, Plaintiff had already disclosed the assault and inappropriate conduct to Tyler Campbell, an employee in Defendant's DEI/recruiting function, on multiple occasions.

93. Mr. Campbell's manager, Kira Irchirl, sat in on the video call when Plaintiff reported Mr. Fennessey's assault to Defendant's in-house counsel, Dolores Linehan. Defendant's Legal/Compliance personnel involved in Plaintiff's report included Lisa Stewart Hughes

16

and Ms. Linehan. Defendant therefore had actual and/or constructive notice of Plaintiff's protected complaints and the workplace misconduct before Plaintiff's termination.

94. Mr. Richardson's retaliation escalated after Plaintiff: (a) reported Mr. Fennessey's assault; (b) took FMLA leave in June 2023; (c) submitted an ADA accommodation request in August 2023; and (d) requested additional FMLA leave on December 7, 2023.

95. Mr. Richardson's retaliatory actions included requiring Plaintiff to email him directly regarding PTO, discouraging or scrutinizing sick time and medical appointments on in-office days, and creating written expectations and policies targeted to Plaintiff that were not applied to other employees.

96. At the time of her December 8, 2023 termination, Plaintiff reported to Ms. Zwarg, whose team was based in Boston, not to Mr. LaRosa's Norwalk consulting team.

97. There continued to be Client Solutions Consultant roles in other offices, including Boston and New York, after the Norwalk layoffs, and that Plaintiff was not provided RIF documentation, notice, severance, or any opportunity to transfer.

98. Defendant's refusal to transfer her to New York after the assault investigation, despite later transferring her to a Boston-based team while keeping her physically tied to Norwalk, further supports pretext and demonstrates that alternatives to termination and continued Norwalk exposure existed.

99. Defendant also failed to pay Plaintiff her final wages within one business day of termination, as required by Connecticut law, and instead delayed her final pay for several days to over a week.

100. Plaintiff alleges that the delayed final pay further reflects Defendant's disregard for Plaintiff's rights and forms part of the broader pattern of retaliatory and unequal treatment after termination.

101. Following her termination, Plaintiff applied for other positions and used her resume to seek replacement employment, but she remained unemployed or underemployed for a substantial period, mitigating her damages.

102. Plaintiff also applied for Medicaid in early 2024 and was denied, leaving her uninsured after her separation from FactSet and increasing the financial and emotional harm caused by Defendant's termination.

103. Plaintiff's experience with Defendant due to their toxic work environment has been detrimental to her health and well-being. Because of the discrimination of Defendant, Plaintiff suffered and continues to suffer loss of income, loss of benefits, loss of career opportunities, severe emotional distress, anxiety, humiliation, medical expenses, and other damages and losses.

## CAUSES OF ACTION

### COUNT ONE: SEX DISCRIMINATION IN VIOLATION OF TITLE VII

104. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 103, as if fully set forth herein.

105. Plaintiff was at all relevant times a highly qualified and competent employee of Defendant.

106. Throughout her employment with Defendant, Plaintiff was intentionally subjected to unequal treatment and to a series of continuous adverse employment actions on account of her sex.

107. Plaintiff was repeatedly treated differently than her similarly situated male coworkers including but not limited to heightened scrutiny, denial of effective protection from sex-based misconduct, denial of reasonable workplace relief, and termination. Specifically:

   a. Mr. LaRosa's December 14, 2022 conduct – staring at Plaintiff's breasts, chuckling, and his apparent erection during a work meeting;

   b. Repeated incidents of others staring at Plaintiff's breasts from September 2022 to October 2023;

   c. Mr. Fennessey's January 18, 2023 breast assault after a company event;

   d. Defendant's inadequate response to Plaintiff's complaints – unsubstantiated finding, instruction to be courteous/professional, no meaningful separation, denial of transfer.

   e. Attendance scrutiny after report – Mr. LaRosa and HR treated Plaintiff's panic/avoidance around Mr. Fennessey as misconduct rather than as the consequence of sexual harassment/assault.

108. Defendant's male employees, including Mr. Fennessey and Mr. LaRosa, were treated more favorably and protected from meaningful consequences despite misconduct toward Plaintiff.

109. Defendant's conduct, by and through its agents and employees, in treating the Plaintiff in a manner unequal to male employees as described above, discriminatorily denied Plaintiff equal treatment on the basis of sex in violation of the Title VII.

110. The discriminatory acts of Defendant as described above were intentional and were substantially motivated on the basis of Plaintiff's sex.

111. As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost

employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

## COUNT TWO: HOSTILE WORK ENVIRONMENT BASED ON SEX IN VIOLATION OF TITLE VII

112. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 111, as if fully set forth herein.

113. Plaintiff was subjected to unwelcome conduct based on sex, including sex-based comments, sexualized staring, sexually inappropriate conduct by Mr. LaRosa, and a physical assault involving contact with Plaintiff's breast by Mr. Fennessey.

114. The conduct was severe and/or pervasive and altered the conditions of Plaintiff's employment.

115. Defendant knew or should have known of the hostile environment and failed to take prompt, effective remedial action.

116. Defendant's response was inadequate, including by failing to meaningfully separate Plaintiff from Mr. Fennessey, instructing her to act courteously and professionally toward him, failing to investigate Mr. LaRosa's conduct when put on notice, and later allowing Mr. LaRosa and Human Resources to target Plaintiff.

117. Defendant's conduct, by and through its agents and employees, in treating the Plaintiff in a manner unequal to male employees as described above, discriminatorily denied Plaintiff equal treatment on the basis of sex.

118. The discriminatory acts of Defendant as described above were intentional and were substantially motivated on the basis of Plaintiff's sex.

119. As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost

20

employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

## COUNT THREE: RETALIATION DISCRIMINATION IN VIOLATION OF THE TITLE VII

120. Plaintiff repeats the allegations of Paragraphs 1 through 119, as if fully set forth herein.

121. Plaintiff asserts a claim for intentional and willful retaliation pursuant to Title VII for reporting a complaint of discrimination.

122. Plaintiff engaged in protected activity by reporting sexual harassment, sex-based misconduct, and the sexual assault by Mr. Fennessey.

123. Defendant knew of Plaintiff's protected activity.

124. After Plaintiff engaged in protected activity, Defendant subjected her to materially adverse actions, including heightened scrutiny, attendance monitoring, denial of effective remedial measures, denial of transfer or other meaningful protection, and termination.

125. Defendant's stated reasons for terminating Plaintiff were pretextual.

126. Plaintiff's protected activity was a but-for cause and/or motivating factor in Defendant's retaliatory conduct.

127. Defendant intentionally and willfully retaliated against Plaintiff for reporting her complaints of discrimination.

128. Defendant should be held liable on this count and Plaintiff should be awarded all full and appropriate relief.

## COUNT FOUR: RACE AND COLOR DISCRIMINATION IN VIOLATION OF TITLE VII

129. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 128, as if fully set forth herein.

21

130. Plaintiff was at all relevant times a highly qualified and competent employee of Defendant.

131. Throughout her employment with Defendant, Plaintiff was intentionally subjected to unequal treatment and to a series of continuous adverse employment actions because Plaintiff is Black/African American woman and is protected from race and color discrimination under Title VII..

132. Throughout her employment with Defendant, Plaintiff was intentionally subjected to unequal treatment, to a series of continuous adverse employment actions, and materially less favorable terms, conditions, and privileges of employment because of her race and color.

133. Plaintiff was repeatedly treated differently than her similarly situated non-Black/African American coworkers including but not limited to, heightened scrutiny, individualized monitoring, unique reporting obligations concerning PTO and medical appointments, accusations of dishonesty, denial of equal workplace flexibility, denial of meaningful workplace relief, and termination.

134. Defendant imposed requirements on Plaintiff that were not imposed on similarly situated non-Black employees, including but not limited to, requiring Plaintiff to report directly to Human Resources regarding PTO, medical appointments, office attendance, and her whereabouts. Defendant did not uniformly enforce those expectations against similarly situated non-Black employees.

135. Defendant protected and credited white male employees while disregarding Plaintiff's complaints and disability-related needs.

136. Defendant's conduct, by and through its agents and employees, in treating the Plaintiff in

a manner unequal to other non-Black/African American employees as described above, discriminatorily denied Plaintiff equal treatment on the basis of race and color in violation of Title VII.

137. The discriminatory acts of Defendant as described above were intentional and were substantially motivated on the basis of Plaintiff's race and color.

138. As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

**COUNT FIVE: RACE DISCRIMINATION AND RETALITION UNDER 42 U.S.C. § 1981**

139. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 138, as if fully set forth herein.

140. Defendant unlawfully and willfully discriminated and retaliated against Plaintiff because of her race as set forth above with regard to the terms, conditions, and opportunities of her employment in violation of 42 U.S.C. § 1981.

141. Defendant unlawfully and willfully engaged in disparate treatment of the Plaintiff in violation of 42 U.S.C. § 1981 as it took adverse actions as set forth above against the Plaintiff, who is Black/African American, who was qualified for her position.

142. Defendant intentionally discriminated against Plaintiff on the basis of race in the making, performance, modification, and termination of her employment relationship.

143. Defendant subjected Plaintiff to race-based disparate treatment, including but not limited to, heightened scrutiny, individualized attendance monitoring, unique PTO and medical-

appointment reporting requirements, accusations of dishonesty, denial of equal workplace flexibility, denial of meaningful workplace relief, and termination.

144. Defendant did not subject similarly situated non-Black employees to the same individualized reporting obligations, scrutiny, accusations, or discipline for comparable conduct. Defendant's treatment of Plaintiff was inconsistent with its treatment of non-Black employees who used PTO, scheduled appointments, worked remotely, arrived later than 8:30 AM., worked from different areas of the office, or otherwise engaged in conduct comparable to the conduct Defendant cited against Plaintiff.

145. Defendant's willful and premeditated termination decision in this case was pretextual and not legitimate and is the cause of Plaintiff's damages, as described herein, for which the Plaintiff seeks redress.

146. Plaintiff's race was a but-for cause of Defendant's discriminatory treatment and termination of Plaintiff.

147. As a result of Defendant's unlawful conduct as aforesaid, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

## COUNT SIX: DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA

148. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 147, as if fully set forth herein.

149. Plaintiff is and was regarded as being disabled by Defendant.

150. Defendant knew of Plaintiff's disability.

151. Defendant is covered by the ADA and are subject to its mandates.

24

152. At all relevant times Plaintiff was qualified to perform the essential functions of her job, with or without reasonable accommodation.

153. Plaintiff suffered adverse employment action because of her disability or perceived disability including but not limited to, heightened scrutiny, denying meaningful workplace relief, disregarding the effects of her disability, and terminating her employment.

154. Plaintiff's disability was a but-for cause of Defendant's adverse actions.

155. The adverse employment actions taken against the Plaintiff as described herein above were substantially motivated by the discriminatory animus of Defendant, by and through its employees, based on Plaintiff's disability and perceived disability.

156. Defendant cannot provide a legitimate, non-discriminatory reason for these adverse actions taken against the Plaintiff. Any excuse proffered by Defendant is not legitimate and is merely a pretext for discrimination based on the Plaintiff's disability and perceived disability.

157. As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

**COUNT SEVEN: DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA FOR FAILURE TO ACCOMMODATE**

158. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 157, as if fully set forth herein.

159. Plaintiff is a person with a disability under the ADA in that she has a record of disabilities and suffers from Depression, PTSD, anxiety, and panic symptoms, which

substantially limit one or more of her major life activities. Further, Plaintiff was regarded as being disabled by Defendant as demonstrated by record of correspondences between the Plaintiff and Defendant and Plaintiff's record of disabilities.

160. Defendant is covered by the ADA and is subject to its mandates.

161. At all relevant times, the Plaintiff was qualified to perform the essential functions of her job, with or without reasonable accommodation.

162. Defendant discriminated against Plaintiff because of her disability by subjecting her to heightened scrutiny, denying meaningful workplace relief, disregarding the effects of her disability, and terminating her employment.

163. Plaintiff's disability was a but-for cause of Defendant's adverse actions.

164. Plaintiff was discriminated against in the terms, privileges, and conditions of her employment by Defendant in that she was denied reasonable workplace accommodations for her disabilities.

165. Defendant knew of Plaintiff's disability and her need for accommodations but refused to provide said accommodations. Instead, Plaintiff was terminated.

166. Defendant failed to sufficiently engage in an interactive process with Plaintiff following her request for accommodations.

167. The adverse employment action taken against Plaintiff as described herein above was substantially motivated by the discriminatory animus of the Defendant, by and through its employees, based on Plaintiff's disabilities and request for accommodations.

168. Defendant cannot provide a legitimate, non-discriminatory reason for this adverse action taken against the Plaintiff. Any excuse proffered by Defendant is not legitimate and is merely a pretext for discrimination based on the Plaintiff's disabilities and request for

26

accommodations.

169. As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

## COUNT EIGHT: DISABILITY RETALIATION AND INTERFERENCE IN VIOLATION OF THE ADA

170. Plaintiff repeats and realleges the allegations of Paragraphs 1 through 169, as if fully set forth herein.

171. Plaintiff engaged in protected activity under the ADA by disclosing her disability, requesting accommodation, seeking medical leave, and opposing disability-related mistreatment.

172. Defendant subjected Plaintiff to materially adverse actions after her protected activity, including heightened monitoring, unique reporting obligations, accusations of dishonesty, and termination.

173. Defendant also interfered with Plaintiff's exercise and benefit of ADA-protected rights by discouraging, obstructing, and penalizing her efforts to obtain accommodation and medical leave.

174. As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

**COUNT NINE: RETALIATION AND INTERFERENCE IN VIOLATION OF THE FMLA**

175.   Plaintiff repeats and realleges the allegations of Paragraphs 1 through 174, as if fully set forth herein.

176.   Plaintiff was an eligible employee under the FMLA, and Defendant was a covered employer.

177.   Plaintiff exercised FMLA rights by taking approved FMLA leave from approximately June 7, 2023 through August 20, 2023.

178.   Plaintiff again attempted to exercise FMLA rights by requesting FMLA leave effective December 7, 2023.

179.   Defendant interfered with Plaintiff's FMLA rights by failing to process and honor her December 7, 2023 FMLA request and by terminating her employment before she could exercise those rights. Defendant's violations of the FMLA were willful because Defendant knew Plaintiff had requested FMLA leave, had previously approved Plaintiff's FMLA leave, understood its obligations under the FMLA, and nevertheless terminated Plaintiff approximately twenty-four hours after her renewed request rather than processing or honoring the request.

180.   Defendant retaliated against Plaintiff for taking FMLA leave and requesting additional FMLA leave by subjecting her to increased scrutiny and terminating her employment approximately twenty-four hours after her December 7, 2023 FMLA request.

181.   As a result of Defendant's unlawful conduct as aforesaid, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

**COUNT TEN: CFEPA DISCRIMINATION, HOSTILE WORK ENVIRONMENT, RETALIATION, AND FAILURE TO ACCOMMODATE**

182. Plaintiff repeats the allegations of Paragraphs 1 through 181, as if fully set forth herein.

183. Plaintiff was at all relevant times a highly qualified and competent employee of Defendant, and a covered person pursuant to the Connecticut Fair Employment Practices Act (hereafter, "CFEPA").

184. Plaintiff is protected under CFEPA because of her sex, race, color, disability, and opposition to discriminatory conduct.

185. Defendant discriminated against Plaintiff in the terms, conditions, and privileges of employment based on sex, race, color, and disability.

186. Defendant subjected Plaintiff to a hostile work environment based on sex and failed to take prompt and effective remedial action after Plaintiff complained.

187. Defendant failed to reasonably accommodate Plaintiff's disability and failed to engage in a good-faith interactive process.

188. Defendant's conduct, by and through its agents and employees, in treating the Plaintiff in a manner unequal to male employees as described above, discriminatorily denied Plaintiff equal treatment on the basis of sex, race, color, and disability in violation of CFEPA.

189. Defendant retaliated against Plaintiff for opposing discriminatory conduct, reporting harassment and assault, requesting accommodation, and requesting/taking protected leave.

190. As a result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

## COUNT ELEVEN: RETALIATION AND INTERFERENCE IN VIOLATION OF CTFMLA

191.   Plaintiff repeats and realleges the allegations of Paragraphs 1 through 190, as if fully set forth herein.

192.   Plaintiff was an eligible employee under the CTFMLA, and Defendant was a covered employer.

193.   Plaintiff exercised CTFMLA rights by requesting and taking leave for her serious health condition from June 7, 2023 through August 20, 2023.

194.   Plaintiff again attempted to exercise CTFMLA rights by requesting CTFMLA leave effective December 7, 2023.

195.   Defendant interfered with Plaintiff's CTFMLA rights by failing to process and honor her December 7, 2023 FMLA request and by terminating her employment before she could exercise those rights in retaliation for exercising and attempting to exercise those rights.

196.   Defendant retaliated against Plaintiff for taking CTFMLA leave and requesting additional CTFMLA leave by subjecting her to increased scrutiny and terminating her employment approximately twenty-four hours after her December 7, 2023 CTFMLA request.

197.   As a result of Defendant's unlawful conduct as aforesaid, Plaintiff has suffered and will continue to suffer damages and losses including, but not limited to, reputational harm, lost wages, lost employment benefits, emotional distress, and Plaintiff has incurred and will continue to incur attorney's fees, expenses, and costs.

## COUNT TWELVE: FAILURE TO TIMELY PAY FINAL WAGES IN VIOLATION OF CONNECTICUT WAGE LAW

198.   Plaintiff repeats the allegations of Paragraphs 1 through 197, as if fully set forth herein.

199.   Defendant terminated Plaintiff on December 8, 2023.

30

200. Plaintiff was entitled to timely payment of all wages due upon termination.

201. Defendant did not issue Plaintiff's vacation payout of $1,563.12 until the December 21, 2023 pay statement, nearly two weeks after termination and approximately ten days after the next-business-day deadline.

202. Defendant failed to pay Plaintiff her final wages within one business day of termination.

203. Defendant's failure to timely pay final wages violated Connecticut wage law, including Conn. Gen. Stat. §§ 31-71c and 31-72.

204. Defendant must be held liable on this Count.

## COUNT THIRTEEN: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

205. Plaintiff repeats the allegations of Paragraphs 1 through 204, as if fully set forth herein.

206. As set forth above, Defendant's conduct created an unreasonable risk of causing Plaintiff emotional distress and did in fact cause such distress.

207. Defendant owed Plaintiff a duty to exercise reasonable care in the manner in which it investigated, confronted, disciplined, and terminated Plaintiff's employment.

208. Plaintiff's distress was foreseeable by Defendant and the emotional distress was severe enough that it might result in illness or bodily harm to Plaintiff.

209. Defendant's conduct as set forth above was the cause of Plaintiff's distress. Said distress was caused by Defendant's acts of discrimination.

210. Defendant breached its duty of ordinary care in its misconduct towards Plaintiff as aforesaid. At the time of a majority of Defendant's discriminatory acts, especially at the time of her termination, Plaintiff was suffering from Depression, PTSD, anxiety, and panic symptoms, which Defendant was aware as Plaintiff had recently taken protected medical leave and had requested accommodations for her mental health disabilities.

211. As a direct result of Defendant's negligent and careless actions, Plaintiff suffered

emotional distress and increased levels of anxiety and escalated bouts of panic attacks, all to her loss and damage.

212.    Defendant must be held liable on this Count.

### COUNT FOURTEEN: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

213.    Plaintiff repeats and realleges the allegations of Paragraphs 1 through 212, as if fully set forth herein.

214.    Defendant, through its agents and employees, engaged in extreme and outrageous conduct, including failing to protect Plaintiff after she reported sexual assault, forcing her to continue working around the accused employee, disregarding her disability and medical documentation, subjecting her to unique and humiliating scrutiny, confronting her in a manner that triggered a panic attack, terminating her immediately after she requested protected medical leave, and failing to timely pay her final wages.

215.    In taking the actions against Plaintiff as aforesaid, Defendant intended to inflict emotional distress, or it knew or should have known that emotional distress was the likely result of its conduct.

216.    The conduct of Defendant in this case was extreme and outrageous and was the cause of Plaintiff's distress.

217.    The emotional distress sustained by Plaintiff was severe.

218.    As a direct result of Defendant's intentional actions, Plaintiff experienced severe emotional distress, including anxiety, panic attacks, humiliation, loss of dignity, and the need for medical treatment.

219.    Defendant must be held liable on this Count.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests the following relief:

(a) Award compensatory damages;

(b) Award punitive damages;

(c) Award attorneys' fees and costs;

(d) Award pre-judgement interest;

(e) Award post-judgement interest; and

(f) Award such other relief in law or equity as this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all questions of fact raised by her Complaint.

Respectfully submitted,

PLAINTIFF
KERRILEE LOGAN

By:    /s/
Genevieve M. Lage (ct30334)
Carey & Associates, P.C.
71 Old Post Road, Suite 1
Southport, CT 06890
(203) 255-4150 tel.
(203) 255-0380 fax
glage@capclaw.com
*Her Attorneys*

33

# EXHIBIT A

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**New York District Office**
33 Whitehall St, 5th Floor
New York, NY 10004
(929) 506-5270
Website:  www.eeoc.gov

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 03/04/2026

**To:** Ms. Kerrilee Logan
181 Vernon Street
MANCHESTER, CT 06042
Charge No: 523-2024-02851

EEOC Representative and email:     DARLAN BASTIDAS
SUPERVISORY INVESTIGATOR
DARLAN.BASTIDAS@EEOC.GOV

---

### NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

The EEOC has granted your request for a Notice of Right to Sue, and more than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By:Arlean Nieto
03/04/2026

Arlean Nieto
Acting District Director

**Cc:**
Jessica C.  Pinto Esq.
Robinson & Cole
One State Street
Hartford, CT 06103

Deborah McKenna Esq.
Hayber, McKenna & Dinsmore
750 Main Street
Hartford, CT 06103


Please retain this Notice for your records.

Enclosure with EEOC Notice of Closure and Rights (05/25)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal**. You should **keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method).  You may also submit a

Enclosure with EEOC Notice of Closure and Rights (05/25)

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 523-2024-02851 to the District Director at Arlean Nieto, 33 Whitehall St 5th Floor, New York, NY 10004.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 523-2024-02851 to the District Director at Arlean Nieto, 33 Whitehall St 5th Floor, New York, NY 10004.

You may request the charge file up to 90 days after receiving EEOC's official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

35

# <u>EXHIBIT B</u>

**STATE OF CONNECTICUT**
**COMMISSION ON HUMAN RIGHTS AND OPPORTUNITIES**

KERRILEE LOGAN
COMPLAINANT                                    CHRO No.    2520247

v.                                                            EEOC No.    523-2024-02851

FACTSET RESEARCH SYSTEMS, INC.
RESPONDENT

**RELEASE OF JURISDICTION**

The Commission on Human Rights and Opportunities hereby releases its jurisdiction over the above-identified complaint. The Complainant is authorized to commence a civil action against the Respondent in the Superior Court for the judicial district in which the discriminatory practice is alleged to have occurred, in which the Respondent transacts business, or in which the Complainant resides. If this action involves a state agency or official, it may be brought in the Superior Court for the judicial district of Hartford.

A copy of any civil action must be served on the Commission by email at ROJ@ct.gov or, if you do not have access to email at Commission on Human Rights and Opportunities, ATTN: Legal Division, 450 Columbus Boulevard, Suite 2, Hartford, CT 06103, at the same time all other parties are served. **The Commission must be served because it has a right to intervene in any action based on a release of jurisdiction pursuant to Conn. Gen. Stat. § 46a-103.**

The Complainant must bring an action in Superior Court within 90 days of receipt of this release. Please note that a Right to Sue Letter must be requested directly from the Equal Employment Opportunity Commission (EEOC) in order to file federal claims in federal court.

**DATE:** February 9, 2026

_____
Tanya A. Hughes, Executive Director

Service:
 Complainant: Kerrilee Logan (Email – Kerrilee.logan@gmail.com)
 Complainant's Attorney: Deborah L. McKenna, Esq.
                  (Email – dmckenna@hayberlawfirm.com)
 Respondent's Attorney: Stephen W. Aronson (Email – saronson@rc.com)
                  Jessica C. Pinto, Esq. (Email – cpinto@rc.com)

.